UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                                  Case No. 13-32195-RBR

NNN Aventura Harbour Centre, LLC,                                       Chapter 11

    Debtor.
_____/

NNN Aventura Harbour                                                    Adv. Pro. No. 13-01830-RBR
Centre, LLC,

    Plaintiff,
v.

NNN Aventura Harbour Centre 1, LLC, NNN Aventura Harbour Centre 2, LLC,
NNN Aventura Harbour Centre 3, LLC, NNN Aventura Harbour Centre 4, LLC,
NNN Aventura Harbour Centre 5, LLC, NNN Aventura Harbour Centre 6, LLC,
NNN Aventura Harbour Centre 7, LLC, NNN Aventura Harbour Centre 8, LLC,
NNN Aventura Harbour Centre 9, LLC, NNN Aventura Harbour Centre 10, LLC,
NNN Aventura Harbour Centre 11, LLC, NNN Aventura Harbour Centre 12, LLC,
NNN Aventura Harbour Centre 13, LLC, NNN Aventura Harbour Centre 14, LLC,
NNN Aventura Harbour Centre 15, LLC, NNN Aventura Harbour Centre 16, LLC,
NNN Aventura Harbour Centre 17, LLC, NNN Aventura Harbour Centre 18, LLC,
NNN Aventura Harbour Centre 19, LLC, NNN Aventura Harbour Centre 20, LLC,
NNN Aventura Harbour Centre 21, LLC, NNN Aventura Harbour Centre 22, LLC,
NNN Aventura Harbour Centre 23, LLC, NNN Aventura Harbour Centre 24, LLC,
NNN Aventura Harbour Centre 25, LLC, NNN Aventura Harbour Centre 26, LLC,
NNN Aventura Harbour Centre 27, LLC, NNN Aventura Harbour Centre 28, LLC,
NNN Aventura Harbour Centre 31, LLC, NNN Aventura Harbour Centre 32, LLC,
NNN Aventura Harbour Centre 33, LLC, NNN Aventura Harbour Centre 34, LLC, and
C-III Asset Management LLC, a Delaware LLC, as Special Servicer for Wells Fargo Bank, N.A.,
as Trustee for Morgan Stanley Capital 1 Inc., Commercial Mortgage Pass-Through Certificates,
Series 2006-IQ12,

    Defendants.
_____/

## MOTION FOR SUMMARY JUDGMENT

Plaintiff, NNN Aventura Harbour Centre, LLC (the "Plaintiff" or the "Debtor"), the Debtor and

Debtor-in-Possession in the above captioned Main Case, by and through undersigned counsel, pursuant

1

to Federal Rule of Civil Procedure 56, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, files this motion for summary judgment, and in support thereof states as follows:

## Summary of Argument

The TICs are just a few of the many victims of the great recession. As the co-owners of a large commercial property, whose value declined by millions of dollars, the TICs found themselves in particularly uncertain circumstances. The TICs attempted to right the Property's financial condition through modification with the primary lender. However, reduced occupancy, lower market rents, deferred maintenance, and largely ignored capital calls prevented a non-bankruptcy resolution.

The Property's present tenant-in-common ownership structure is not working, as evidenced by, among other things, the failed capital calls. Further, the Property is subject to foreclosure and eventual fire-sale by the secured creditor.

The Debtor seeks authority to sell the entire Property (both debtor and non-debtor interests) pursuant to 363(h). Consistent with the Debtor's Plan of Reorganization (Main Case, ECF No. 97) such sale would be to a new entity in which all TICS are entitled to preserve their investment in the Property and to maintain their tax attributes.

Accordingly, this Court ought to enter Judgment in favor of the Debtor and authorize a 363 Sale of the Property as proposed herein.

## Standard

1.      Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

2.      "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Webb v. Int'l Bus. Machs. Corp.*, 458 F. App'x 871, 875 (11th Cir. 2012) quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

### Procedural History

3.      On September 17, 2013 (the "Petition Date"), Debtor filed a voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").[1] Since that time, Debtor has operated as a debtor-in-possession pursuant to 11 U.S.C. Sections 1107 and 1108.

4.      As of the date hereof, no creditors' committee has been appointed in this case. In addition, no trustee or examiner has been appointed.

5.      On November 18, 2013, the Debtor commenced the above-styled adversary (the "Adversary Proceeding" or "A.P.") against the Other TICs[2] and Lender[3] by filing a complaint (A.P. ECF No. 1) (the "Complaint").

6.      The Adversary Proceeding seeks a compelled sale of the Property under Section 363(h) of the Bankruptcy Code (the "363 Sale").

7.      As of this date, the Other TICs have not filed a response to the Complaint.

### Material Undisputed Facts

8.      The parties to the instant lawsuit are the record title holders and co-owners, as tenants-in-common (together, the "TICs" or any of them a "TIC"), of that certain 10-story Class A office

---

[1] Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

[2] Other than the Debtor, the TICs are defined as the "Other TICs".

[3] C-III Asset Management LLC, a Delaware LLC, as Special Servicer for Wells Fargo Bank, N.A., as Trustee for Morgan Stanley Capital 1 Inc., Commercial Mortgage Pass-Through Certificates, Series 2006-IQ12 ("Lender").

building (approximately 213,878 square feet) with an adjacent 1-story structure, located at or near 18851 NE 29th Avenue, Aventura, Florida (the "Property").[4]

9. In early 2006, Debtor[5] was formed to acquire an undivided interest in the Property and anticipated selling other undivided interests in the Property to investors (the "TIC Deal").

10. Together, the Debtor and the Other TICs own a 100% undivided interest in the Property as tenants-in-common.

11. After the Debtor's formation, through a series of transactions during and after 2006, Debtor acquired the Property for approximately $75 million dollars (of which, approximately $51 million was financed by Jones LaSallee Bank National Association[6] on senior priority basis and an additional approximately $11.5 million was financed by Lender as a mezzanine loan), and sold undivided interests in the Property to the Other TICs.

12. The structure of the TIC Deal appealed to certain of the TICs because, among other things, they could realize or maintain certain tax benefits (the "Tax Benefits").

13. The Loan Documents include, among other things, a certain promissory note in the principal amount of $51,180,000 (the "Original Note"), and certain security instruments related to same (the "Security Instruments").

14. Due in large part to the credit crisis and Great Recession, after the fourth quarter of 2008 there was a significant decline in the commercial real estate market in South Florida.

15. As such, the Property suffered from a loss of revenues because of low tenancy rates. The loss of certain of its revenues corresponded with an inability to adequately finance necessary repairs. Failure to make necessary repairs resulted in increased costs of maintenance.

---

[4] The Lender has been made a party to the instant action for, among other things, notice purposes and to the extent that its rights may be affected in some way by the relief sought herein.

[5] Debtor's present controlling interest is owned by Paddockbunker, LLC. PaddockBunker, LLC is unrelated to the Debtor's 2006 controlling interests.

[6] Presently, the Lender represents the counterparty to the Loan Documents (as defined herein).

16. Prior to July 2010, revenues derived from the Property were insufficient to pay all of the Property's expenses, including, among other things, the funding of certain tenant improvement and leasing reserve accounts.

17. On July 1, 2010, the TICs and Bank entered into a *Second Modification to Mortgage, Security Agreement and Fixture Filing and Modification of Note* (the "2nd Modification"), in an attempt to right the Property's financial condition. Under the 2nd Modification, certain interest payments were deferred (the "Deferred Interest") until no later than June 1, 2013 (the "Interest Payment Deadline").

18. In advance of Interest Payment Deadline, based on the budgeted revenues and expenses, it appeared that the Property would not generate sufficient revenues to timely satisfy the Deferred Interest.

19. On or about May 17, 2013, the Property Manager made two capital calls to the TICs in the total amount of $2,412,483, which capital calls were necessary to allow for satisfaction of various outstanding obligations arising from the operation of the Property (the "Capital Calls"). As of this date, none of the Other TICs have contributed their pro rata share to satisfy the Capital Calls.

20. Ultimately, revenues generated by the Property proved insufficient to satisfy the entirety of the Deferred Interest, approximately $921,595, by the Interest Payment Deadline.

21. Consequently, the entirety of the Deferred Interest was not paid to Lender by the Interest Payment Deadline.

22. On August 28, 2013, the Lender issued a default and acceleration letter to the TICs.

23. Fearing a foreclosure action by the Lender that would effect a complete depletion of the value of the Property at an uncontrolled liquidation fire-sale/foreclosure auction, on September 17, 2013, Debtor commenced the above styled main bankruptcy proceeding.

24. On December 20, 2013, the Debtor filed its Plan of Reorganization (Main Case, ECF

No. 97) (the "Plan") and Disclosure Statement in Support of Plan of Reorganization (Main Case, ECF No. 98) (the "Disclosure Statement").

### Proposed 363 Sale

1. Throughout this case, in an effort to maximize value for all of the constituencies, the Debtor has negotiated with the Lender terms that would allow the TICs to participate, in some way, in the ownership of the Property and permit TICs to maintain their Tax Attributes.

2. The Plan and Disclosure Statement describe in detail the proposed transfer of the Property requested herein.

3. Consistent with the Plan, this Motion seeks to effectuate the reorganization of the ownership structure of the Property on, among others, the following terms:

   I. **Formation of New Co.[7] and Conversion of TIC Interests.** New Co. shall be formed by Debtor for the purpose of acquiring a fee simple interest in the Property from the TICs in connection with this Adversary Proceeding.[8]

       **a.** New Co. shall be a manager managed limited partnership with a corporate General Partner ("GP") and a Limited Partner ("LP").[9] LP will be entirely comprised of former TICs and will have two classes of partnership units: Class A voting units ("Active LP") and Class B non-voting units ("Passive LP"). GP will be comprised of RF2 and Sov. Co. ("Capital Partner") who will hold their interests in GP 85%/15%, respectively.

       **b.** GP and Active LP shall share in the profits of New Co. in proportion to their units of ownership interest in New Co. Units of GP and Active LP shall be given equal weight in connection with the allocation of New Co. profits. Units of Passive LP shall carry no weight. Active LP partners have senior voting rights in LP and will share the profits of LP in proportion to their relative ownership of units of Active LP; Passive LP partners will not share in LP profits and are not entitled to vote.

       **c.** New Co. will raise no less than $10,000,000 in new capital to fund the Plan and provide a mechanism for the TICs to maintain an interest in the Property without an additional cash payment. Together, Active LP and GP shall issue a total of 1,000 partnership units valued at $10,000 each (the "Conversion Price"), and Passive

---

[7] All capitalized terms not defined herein shall have the same meaning as ascribed to them in the Plan.

[8] Complete terms of the proposed transfer are contained in in the Transfer Terms, attached hereto as Exhibit "A".

[9] A partnership agreement in substantially the same form as the partnership agreement for New Co. is attached hereto as Exhibit "B".

LP shall issue 1,000 units valued at .01 cents each. Partnership units will be made available to the TICs and Capital Partner on the following Schedule:

(i) First, 1,000 units of Active LP will be made available to the eligible TICs. TICs that actively oppose the transfer of the Property to New Co., as will be determined by the Debtor in its sole and absolute discretion, are ineligible to convert their interests in the Property into units of Active LP ("Disqualified TICs"). Subject to applicable law, Active LP unit holders may be entitled to enjoy a 721 tax election which shall continue tax deferred status until the sale of the Property by New Co.

(a) Each TIC, other than a Disqualified TIC, is entitled to convert its proportionate interest in the Property, plus payment of the Conversion Price, into a proportionate interest of Active LP units. For example, an eligible TIC that owns 5.2%[10] of the Property may convert its interest in the Property, plus a maximum cash payment of $600,000, into a maximum of 60 units of Active LP (a "Participating TIC").[11]

(b) To do so, a participating TIC must fill out and deliver a Notice & Conversion Form, all attachments thereto, and proof of funds, to Debtor's counsel on or before February 5, 2014. The Notice & Conversion Form, or a document in a substantially similar form, is attached hereto as Exhibit "C".

(c) On or before fourteen (14) business days prior to the Conversion Date, every Participating TIC shall deliver to New Co. cash equal to its Conversion Price. If any Participating TIC fails to deliver to New Co. cash equal to its Conversion Price on or before the Conversion Date, such TIC's interest in the Property shall be converted into units of Passive LP equal to their percentage interest in the Property.

(ii) Second, 1,000 units of GP, less the amount of converted units of Active LP (the "Available Units"), will be made available to Capital Partner.

(a) Capital Partner shall acquire all Available Units in exchange for payment of the Conversion Price. For example, if 400 units of Active LP are converted, 600 units of GP will be made available for Capital Partner. In this example, Capital Partner will pay to New Co. $6,000,000 in exchange for said 600 Available Units of GP.

(b) On or before seven (7) business days prior to the Conversion Date, Capital Partner shall deliver to New Co. cash equal to the Conversion Price of the Available Units.

---

[10] Percentage interests in the Property shall be rounded up to the next whole number. Only whole units of Active LP are available.

[11] A TICs' percentage interest in the Property is the maximum a TIC may participate in Active LP. A TIC may convert its interest in the Property, plus payment of the Conversion Price, into units of Active LP in an amount less than their proportionate interest in the Property; i.e., a 5% owner of the Property may acquire 40 units of Active LP at the Conversion Price.

7

    (iii)    Third, all TICs are entitled to convert their interest in the Property into units of Passive LP in proportion to their interest in the Property. To do so, a TIC may fill out and deliver a Notice & Conversion Form indicating its preference to convert its interest in the Property into units of Passive LP on or before February 5, 2014. All TICs who fail to timely deliver a Notice & Conversion Form shall have their interest in the Property be converted into units of Passive LP. Subject to applicable law, Passive LP unit holders may be entitled to enjoy a 721 tax election which shall continue tax deferred status until the sale of the Property by New Co.

    (iv)    Fourth, on the Conversion Date, all of the TICs' interests in the Property shall be converted into units of Active LP, Passive LP, or shall be terminated.

**II.** **Transfer of Property to New Co.** By no later than the Effective Date (as defined in the Plan), the transfer of the Property from the TICs to New Co. shall be closed. At Closing, the TICs, or the Disbursing Agent if directed by the Court in its order granting the Debtor the relief it sought in this Adversary Proceeding, shall convey and transfer to New Co., the Property free and clear of all claims and interests of the TICs, by signing and delivering to New Co. such deeds, bills of sale, assignments and other Conveyance Documents, including assignments of leases, as New. Co. reasonably requests. At Closing and upon receiving the Closing Costs, Lender shall execute and deliver to New Co. any and all documents necessary to effectuate the transfer of the Property to New Co. including any and all modifications or assignments of the Loan and Loan Documents to New Co. as necessary for New Co. to assume the Loan and Loan Documents as modified by the Loan Modification.

**III.** **Obligations of New Co.**

    a. By no later than the Effective Date, New Co. shall execute any and all documents necessary to effectuate the assumption of the outstanding Loan between Lender and the TICs and the obligations imposed by the Loan Documents including the Cash Management System related thereto except as modified by the Loan Modification;

    b. By no later than the Effective Date, New Co. shall pay down the principal balance of the Loan with cash in an amount of no less than $5.07 million or 10% of the outstanding loan balance, whichever is greater;

    c. By no later than the Effective Date, New Co. shall pay a 1% loan modification fee, as well as reimburse the Lender for all costs and expenses including but not limited to legal and title costs related to the contemplated assumption and modification, the Chapter 11 case, and any prior payment default(s)

    d. By no later than the Effective Date, New Co. shall deposit funds in separate reserve accounts in the name of New Co., but held at a depository institution approved by Lender, in the following amounts: $91,294.00 in a 'replacement' reserve; $3,984,761.00 in a TILC Reserve, and $55,000.00 in a '2nd Floor' reserve account.

e. By no later than the Effective Date, New Co. shall deposit with the Disbursing Agent Cash available for distribution in an amount not less than the aggregate of the Minimum Distribution Amount and the Set Aside. If the Disbursing Agent is not holding Cash equal to or greater than the Minimum Distribution Amount and Set Aside on or before the Effective Date, within five (5) business days of the Effective Date, New Co. shall deliver Cash to the Disbursing Agent in an amount equal to the difference between the aggregate of the Minimum Distribution Amount and Set Aside, and the amount of Cash then available to the Disbursing Agent.

f. By no later than the Effective Date, New Co. shall deposit into a segregated Security Deposit Account funds sufficient to satisfy all Allowed Class 3 Claims.

## **Argument**

4. 11 U.S.C. §363(h) provides that a debtor may sell both its interest and the interest of any co-owner in property held as tenants in common property if:

(1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

5. Although not explicitly an element, the Property is owned as tenants in common by the Debtor and the Other TICs.

6. Here, all of the elements necessary to compel a section 363(h) sale are satisfied.

### *Partition of the Property is Impracticable*

7. In this case, the co-owned Property is a single 10 story class A building. The Property's value is tied to, among other things, the ability to lease the entire Property.

8. The Property is co-owned by approximately 33 entities.

9. The Debtor and the Other TICs own a 100% undivided interest in the Property as tenants-in-common.

10. As tenant-in-common, none of the co-owners own any particular portion of the Property. Nor is there an appropriate method to divide the Property in a pro rata manner. *In re Leonard*, 418 B.R. 477, 489 (Bankr. S.D. Fla. 2009) (recognizing the difficulty in partitioning where co-owners hold undivided interest in single property).

11. Accordingly, it is impracticable to divide or partition the Property.

### *Sale of the Estate's Interest in the Property would Realize Significantly Less than a Sale of Whole*

12. The Debtor owns an approximately six percent interest in the Property.

13. Upon information and belief, value of just the Debtor's interest in the Property would not realize significant value.

14. Debtor's partial interest in the Property may be unappealing to a prospective purchaser due to the prospect of becoming a co-owner with approximately 32 other entities.

15. Alternatively, a sale of the whole Property would generate significant value for the estate.

16. As part of the Plan, among other things, (i) Lender will allow New Co. to assume approximately $47 million dollars of the TIC's present debt; and (ii) New Co. plans to raise sufficient funds to pay all of Debtor's creditors in full.

### *The Benefit to the Estate Outweighs any Detriment to the Co-Owners*

17. The Property is subject to certain encumbrances, including the Lender's first priority mortgage.

18. Under the Plan, the transfer of the Property will include an assumption of the Loans, as modified by the Lender to New Co. Plan at §6.4.

19. Additionally, the Plan's contemplated transaction seeks to allow the TICs to maintain their tax attributes.

20. As such, the results of a 363 sale contemplated herein confer substantial benefits to the TICs, Debtor's creditors and other parties-in-interest.

21. In contrast, detriment to the Other TICs, if any, is minimal.

22. Presently, the Property is subject to foreclosure by the Lender.

23. Absent approval of the sale contemplated herein, the TICs may lose their interests through a foreclosure proceeding and their Tax Benefits may not be preserved.

24. Therefore, the benefits to the estate outweigh any detriment to the co-owner Other TICs.

### *The Property is Not Used for Energy*

25. The Property functions as a commercial office building. The Property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

### **Conclusion**

26. The sale proposed herein and through the Plan provides incredible value for the TICs, the creditors, and all parties-in-interest.

27. Absent approval of the sale contemplated herein, the Property is likely to sell at a foreclosure sale for far less value.

28. Accordingly, this Motion ought to be granted to authorize a sale in accordance with the Plan.

WHEREFORE, Debtor respectfully requests that this Court enter an order pursuant to 11 U.S.C. §363(h) (i) granting this Motion for Summary Judgment; (ii) allowing and authorizing Debtor to sell the estate's and Other TICs' interest in the Property in accordance with the Plan, to satisfy all

liens against same, to retain the estate's portion of the proceeds, and to deliver to Defendants their portion of the proceeds, if any; and (iii) such other and further relief as this Court deems appropriate.

Respectfully submitted this 3rd day of January, 2013.

> MESSANA, P.A.
> *Counsel for Plaintiff*
> 401 East Las Olas Boulevard, Suite 1400
> Fort Lauderdale, Florida 33301
> Telephone:  (954) 712-7400
> Facsimile:    (954) 712-7401
> Email:  tmessana@messana-law.com
>
> /s/ Thomas M. Messana
> Thomas M. Messana, Esq.
> Florida Bar No. 991422
> Brett D. Lieberman, Esq.
> Florida Bar No. 69583
> Thomas G. Zeichman
> Florida Bar No. 99239